THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TYRONE H.,

          **Plaintiff,**

v.                                 Civil Action 2:22-cv-3652
                                   Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

          **Defendant.**

## OPINION AND ORDER

Plaintiff, Tyrone H., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 7) and **AFFIRMS** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff filed his application for SSI on October 17, 2019, alleging that he was disabled beginning February 2, 2018, due to manic depression, "problems with feet – unable to walk[,]" and diabetes. (R. at 165). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on July 28, 2021. (R. at 31–47). The ALJ denied benefits in a written decision on August 26, 2021. (R. at 11–30). That became the final decision of the Commissioner when the Appeals Council denied review. (R. at 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on October 10, 2022 (Doc. 1), and the Commissioner filed the administrative record on December 2, 2022 (Doc. 6). The matter has been briefed and is ripe for consideration. (Docs. 7, 9, 10).

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's testimony from the administrative hearing as follows:

[Plaintiff] testified that he has constant pain in his feet. He testified he had surgery on his foot with hardware, but it did not help. [Plaintiff] testified he was treating with Tylenol and Advil. He testified his feet get achy when it is about to rain. He testified he has difficulty walking for days until the swelling goes down. He testified he can walk half a block before needing to stop. His feet swell if he stands for too long. He has to lay down or props his feet up. He testified he has to rest his foot three days out of the week. [Plaintiff] testified he takes medication for high blood pressure. [Plaintiff] testified he takes medication for depression and anxiety. He testified the medication helps. [Plaintiff] testified he has panic attacks. He has flashbacks from prison. He has difficulty getting along with people. He has anger outbursts.

(R. at 19).

### B. Relevant Medical Evidence

The ALJ summarized Plaintiff's medical records as to his physical issues as follows:

[Plaintiff]'s treatment records document a history of hypertension, diabetes, and bilateral hammertoe deformities. However, objective findings are not fully consistent with [Plaintiff]'s complaints. Records prior to [Plaintiff]'s protective filing date note a history of painful lesions on his feet, with moderate improvement with debridement and orthotics (Exhibit 7F/1). As of an April 2019 podiatry visit, examination noted bilateral 2, 3, 4, and 5 hammer toe deformities, and moderate recurrent left Hallux abducto valgus (HAV) deformity and mild left hallux extensus; and severe right hallux extensus deformity (Exhibit 7F/1). X-rays of the bilateral feet showed no fracture, stress fracture or subluxation, with retained hardware in the left hallux proximal phalanx, recurrent left [HAV], and delta phalanx with adduction of the left toe. He was counseled on surgery in the form of a left great toe joint fusion, left 2nd hammertoe repair, left 3rd metatarsal condylectomy, left 4th toe tenotomy, left foot skin lesion excision.

As of his May and June preoperative evaluations, [Plaintiff] denied joint pain, stiffness, arthritis, weakness, shortness of breath, dizziness, headaches, or difficulty walking (Exhibit 8F/20). A stress echo was negative for evidence of ischemia (Exhibit 8F/3). However, a transthoracic echocardiogram revealed evidence of moderate left ventricle hypertrophy, trivial mitral valve regurgitation and trace-mild tricuspid regurgitation. (Exhibit 8F/14). [Plaintiff] was assessed with hypertension and mild left ventricular hypertrophy (Exhibit 8F/14). However, subsequent treatment records note [Plaintiff]'s surgery was cancelled due to clearance issues. He was advised he would need to stop smoking for surgery (Exhibit 7F/5). [As of] October 30, 2019, surgery remained deferred as [Plaintiff]

continued to smoke 1—2 cigarettes a day. Examination noted diminished sensation to light touch in the toes, but negative Tinel's sign and no reflex deficits. The skin was warm, dry[,] and intact, without open lesions. There was no erythema, calor or ecchymosis noted. There were well demarcated areas of hyperkeratosis. Strength testing was 5/5 to all groups. Bilateral hammertoe deformities were noted, as well as recurrent left HAV and mild left hallux extensus and severe right hallux extensus deformity, He was given custom orthotics, underwent debridement, and advised to follow-up in three months (exhibit 8F/7).

The record lacks significant treatment for his foot for another year. At a December 2019 cardiology follow-up for smoking, left ventricle hypertrophy and hypertension (Exhibit 13F/10). He reported he was still smoking and wearing nicotine patches. He was tolerating his blood pressure medication well. He reported one instance of chest pain the week prior taking out the trash, which stopped when he rested. Examination noted normal gait and station and normal exam of the extremities. Hypertension was unchanged and he was to continue on his current medications. His LVH was noted to be moderate on echo, and he was to continue controlling his blood pressure (Exhibit 13F/10). ***

On follow-up with his primary care provider in September 2020[,] [Plaintiff] reported feeling well. Poor compliance with treatment was noted. His most recent A1C was 5.8 without medication. Musculoskeletal examination was normal. He had normal heart sounds, regular rate, and regular rhythm without murmurs. He exhibited normal gait, normal sensation, and normal coordination. An eye examination revealed no diabetic neuropathy (Exhibit 13F/14). [Plaintiff] returned to podiatry on October 19, 2020[,] and was released for surgery (Exhibit 12F/1). At his November 5, 2020[,] preadmission testing, he reported his diabetes was controlled on diet and his hypertension was well controlled on his home regimen [(]Exhibit 11F/20). He denied a history of cardiopulmonary disease functional capacity was at least 4 METs without symptoms of [chest] pain or shortness of breath. Review of systems was negative (Exhibit 11F/20). On November []17, 2020 he underwent a left great toe joint fusion, left gastrocnemius recession, left second hammertoe repair, left tibial and fibular sesamoid excisions, left 3rd metatarsal osteotomy, left 4th toe extensor tenotomy and left plantar foot skin lesion excision (exhibit 12F/4). [Plaintiff]'s recovery appears routine. As of his 3-week follow-up, his pain was well controlled with medications. He was wearing a CAM boot with crutches for assistance. He was healing appropriately. Examination revealed moderate edema, no [signs] of infection and left toes straight in alignment. Hardware was intact (Exhibit 12F/8-11). As of his 8-week follow-up on January 15, 2021, he presented wearing a CAM boot. He reported feeling pretty good since his last visit and he denied pain. He was advised he could start to wean into athletic shoes over the next two weeks. Again, on February 12, 2021[,] he was healing appropriately. He reported his pain was minimal with some tenderness and mild stiffness. He was to transition to all shoe types and released to pursue all activities (Exhibit 12F/14).

>[Plaintiff] presented to cardiology for follow-up on hypertension on February 25, 2021. He denied chest pain, dyspnea, palpitations, dizziness, or edema. An EKG revealed no changes. Examination revealed normal gait and station. He remained on a transdermal nicotine patch and was strongly encouraged to stop smoking (Exhibit 13F/1).

(R. at 19–21).

The ALJ summarized Plaintiff's medical records as to his mental issues as follows:

>Turning to [Plaintiff]'s mental impairments, his treatment has been conservative and objective findings on examination limited. As of his August 2019 preoperative evaluation, he did not report any anxiety or depression. He denied suicidal ideation. He denied sleeping abnormalities (Exhibit 5F/7). There is little evidence of any mental health treatment prior to his application date, and records indicate he sought mental health treatment in October 2019 (Exhibit 5F).
>
>On December 3, 2019, [Plaintiff] underwent a psychological consultative examination with John Reece, Psy.D at the request of the agency (Exhibit 9F). It was noted [Plaintiff] had prior IQ testing in the form of the WAIS III with a full[-]scale IQ of 57 (Exhibit 1F). He reported a history of learning problems and he quit school in the 8th grade. He reported he was arrested twice as an adult for felony aggravated assault and home invasion, and he was in prison for 15 years before being released in June 2019. He reported problems with people of authority. He reported a history of alcohol and cocaine use, but had not used either in years. He reported he had never received outpatient counseling. He denied taking psychotropic medications (Exhibit 9f). On examination, he was clean and neatly dressed. Eye contact was good. There was no psychomotor agitation or retardation. He had rigid posture. [H]is speech was unimpaired. Associations were well organized to concrete. Affect was constrict[ed] and his prevailing mood was mildly anxious. [Plaintiff] reported mood swings and agitation. However, he denied ever having a panic attack. He denied phobias or fears. There was no evidence of hallucinations or delusions. [Plaintiff] was alert, clear and not confused. He was oriented to person[,] place, situation[,] and time. His short-term memory was poor, but his working memory was good to fair. Abstract reasoning was poor. However, comprehension was fair. Concentration was satisfactory and task persistence was satisfactory. His pace of problem solving was satisfactory. [Plaintiff] was assessed with unspecified depressive disorder, unspecified trauma disorder, alcohol and cocaine use disorders in remission and borderline intellectual functioning.
>
>[Plaintiff] began receiving outpatient psychotherapy in January 2020 (Exhibit 10F/33-52). He further sought outpatient psychiatric treatment. He presented for his initial evaluation on January 21, 2020[]. On examination he was well groomed with normal behavior and speech (Exhibit 10F/17). Associations were normal and thoughts and thought processes were normal. He exhibited euthymic mood, and full range of affect, with fair insight /judgment, normal memory, and normal attention

and concentration (Exhibit 10F/17-18). He was diagnosed with posttraumatic stress disorder, unspecified depressive disorder, unspecified anxiety disorder, and borderline personality disorder. On March 25, 2020, he presented for a videoconference psychiatric visit. He reported his mood was better. His anxiety and depression were better. He reported his sleep and appetite as ok. He again exhibited normal behavior, normal speech, normal associations, normal thoughts, euthymic mood, and full range of affect, good judgment and insight, normal recent and remote memory, normal attention and concentration and normal fund of knowledge (exhibit 10F/28). [Plaintiff] underwent a dosage increase in his lamictal.

Subsequent primary care records lack positive mental status examination findings. The records note no[] complaints of anxiety, mood changes, or change in sleep pattern (Exhibit 14F/8). Again[,] in September 2020 he reported his anxiety, depression and mood were good when complaint with medication. Mental status examination findings remained unchanged (Exhibit 15F/23). In November 2020, he reported doing good at his medication dosage without needing further dosage increases. His mood, appetite, sleep, anxiety[,] and depression, were reported to be good. Mental status examination was again normal (Exhibit 15F/34). His most recent psychiatric visit in June 2021 noted good mood, appetite, sleep and "up and down" anxiety and depression. However, on examination he exhibited normal behavior, normal speech, normal associations, no suicidal ideations, normal thoughts, normal thought process, euthymic mood, full range of affect, good insight/judgment, normal orientation, normal recent and remote memory, normal attention and concentration, and normal fund of knowledge (exhibit 15F/45).

(R. at 21–22).

### C. The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful employment since October 17, 2019, the application date. (R. at 16). The ALJ determined that Plaintiff has the following severe impairments: bilateral hammertoe and foot deformities, status post left foot surgery, left ventricular hypertrophy, diabetes mellitus and osteoarthritis, personality disorder, anxiety disorder, depressive disorder, borderline intellectual functioning, alcohol use disorder in remission. (*Id.*). Still, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ concluded that:

[Plaintiff] has the residual functional capacity to perform light work as defined in

5

>20 CFR 416.967(b) except [Plaintiff] can stand/walk 4 hours in an 8- hour work day and sit for 6 hours in an 8-hour work day; frequently climb ramps or stairs; must avoid ladders, ropes, and scaffolds; frequently stoop, kneel, crouch and crawl; tolerate occasional exposure to vibration; must avoid hazards including moving machinery, heavy machinery and unprotected heights. [Plaintiff] can tolerate simple routine tasks; occasional and superficial interaction with coworkers and supervisors (that which is beyond the scope of performance of job duties and job functions for a specific purpose and a short duration) must avoid interaction with the public; no fast pace or strict production quotas; occasional changes and occasional decision making; must avoid tandem work; and positions requiring negotiation, management, or conflict resolution skills.

(R. at 18).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 19).

Plaintiff has no past relevant work. (R. at 24). Relying on the vocational expert's testimony, the ALJ concluded that considering his age, education, work experience, and the above RFC, Plaintiff could perform jobs that exist in significant numbers in the national economy, such as a collator operator or a tacking machine tender. (R. at 25). She therefore concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, at any time since October 17, 2019. (*Id.*).

**II.    STANDARD OF REVIEW**

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

6

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### III. DISCUSSION

In his Statement of Errors, Plaintiff contends that the ALJ violated 20 C.F.R. § 416.920c(b)(2) during her evaluation of the administrative findings by state agency psychologists, Michael Cremerius, Ph.D. and Paul Tangeman, Ph.D., and the state agency physicians, Steven E. McKee, M.D. and Abraham Mikalov, M.D., by failing to evaluate their opinions for supportability. (Doc. 7 at 5–8). The Commissioner counters that in crafting Plaintiff's RFC, the ALJ properly considered the record, evaluated the opinions in accordance with the appropriate regulations, and incorporated the limitations supported by the record into the RFC finding. (Doc. 9). For the reasons that follow, the Court finds Plaintiff's assignment of error without merit.

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id*. *See also* 20 C.F.R. §§ 404.1513(a), 404.1520c (2017).

The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1] 20 C.F.R. § 404.1513(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R. § 404.1520c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." § 404.1520c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. 20 C.F.R. § 404.1520c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(2).

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 404.1513(a)(2), (5).

8

An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. 20 C.F.R. § 404.1520c(b)(2).

Thus, the role of the ALJ is to articulate how she considered medical opinions and how persuasive she found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). The role of the Court is not to reweigh the evidence, but to make sure the ALJ employed the proper legal standard by considering the factors and supported the conclusion with substantial evidence. *Id.*, at *14.

### A. Review of the State Agency Psychologists' Opinions

In evaluating the state agency psychologists' opinions, the ALJ found:

> The opinions of the state agency psychological consultants are generally persuasive. However, the undersigned has accommodated the opinions in vocationally relevant terms, for example defining superficial interactions, consistent with [Plaintiff]'s report of difficulty with authority, but cooperative presentation on exam. The undersigned finds no strict production quotas in light of [Plaintiff]'s borderline intellectual functioning, combined with noted difficulties dealing with stressors and history of agitation.

(R. at 23).

Plaintiff says "[t]he ALJ failed to articulate what [the psychologists] said they based their opinions on." (Doc. 7 at 7). He says this alleged failure to discuss supportability requires remand because it prevents the Court from engaging in a meaningful review of the ALJ's decision. (*Id.* at 8). The Court disagrees with this characterization of the ALJ's analysis.

At the outset, the Court notes the inherent lack of clear delineation between supportability and consistency when an ALJ evaluates the opinion of a reviewer—like a state agency physician—who forms her opinion after a holistic review of the medical evidence of record. Consider, for example, a case in which there has been little or no change to the medical evidence of record

9

between the time the reviewer issues her finding and the ALJ conducts a hearing. In that instance, the evidence upon which the reviewer supported her finding—the complete medical record at the time of her finding—would be virtually identical to the evidence with which the opinion is consistent or inconsistent—the complete medical record at the time of the ALJ's hearing. The ALJ is left in a position in which she is unable to consider supportability without simultaneously addressing consistency, and vice versa. A plaintiff might semantically allege error in such a case—saying that the ALJ only addressed consistency because she compared the reviewer's opinion to the entirety of the record. But the ALJ would have still fulfilled the purpose of the regulation: to give a fulsome review to medical opinions and prior administrative findings, paying particular attention both to how the opinions are internally supported and explained, and how they compare to the record as a whole.

Contrast this with a medical opinion rendered by a treating physician. There, supportability and consistency are more clearly distinguished. The physician supports her opinion with her own treatment notes, objective medical findings, and experience with the plaintiff. Her opinion is consistent (or not) with the entire universe of the medical evidence of record.

Other courts in this Circuit have considered this facet of the supportability/consistency framework. In *Vaughn v. Commissioner of Social Security*, the Western District of Tennessee addressed an allegation that an ALJ had not properly assessed the supportability of opinion evidence provided by a physician acting as a "reviewing specialist[ ] . . . ." No. 20-cv-1119-TMP, 2021 U.S. Dist. LEXIS 134907, at *24 (W.D. Tenn. July 20, 2021). The court found that consistency had sufficiently been addressed by the ALJ, because she explicitly detailed why the opinion was inconsistent with other aspects of the record. *Id.* at *25–27. But, the ALJ had not meaningfully discussed supportability. *Id.* at *27–32.

Notably, however, the physician based his opinion on other medical records "he reviewed, which completely encompasse[d] the relevant period of discovery." *Id.* at *30–31. In other words, the physician operated in the manner of a state agency reviewer, conducting a holistic review of the medical evidence of record before rendering an opinion. So, the court determined that while the ALJ had not observed 20 C.F.R. § 404.1520c to the letter, she had:

> achieved the regulations' goal of providing notice to [the plaintiff] of why [the physician's] opinion was not persuasive. [The physician]'s opinion was entirely predicated on a review of [the plaintiff]'s medical history and, when recounting that same medical history, the ALJ identified several instances where [the plaintiff]'s medical records did not support a finding of disability. As such, the ALJ's discussion of [the plaintiff]'s medical history is, in essence, a discussion of whether the evidence [the physician] reviewed could actually support his conclusions. Thus, while not being a direct attack on the supportability of [the physician]'s opinion as contemplated by the regulations, the ALJ's opinion is only one step removed from articulating why she believed the basis for [the physician]'s opinion was faulty, i.e. an explanation of the supportability factor.

*Id.* at *34–35. Accordingly, the court concluded that any error in the assessment of the opinion was harmless and remand was not necessary. *Id.* at *36.

This same harmless-error analysis should apply to an ALJ's decision which clearly discusses the consistency of a state agency reviewer's opinion, when that same opinion was formed upon records which encompassed the relevant period of discovery and the ALJ elsewhere discusses those records in detail. Here, because the record had not materially developed from the time of the state agency findings to the time of the ALJ's decision, the ALJ's discussion of the findings can be understood to touch upon both supportability and consistency. For example, the ALJ noted that she found the opined superficial social interactions "consistent with the [Plaintiff]'s report of difficulty with authority, but cooperative presentation on exam." (R. at 23). Elsewhere, the ALJ described in detail a December 2019 psychological consultative examination with John Reece, Psy.D, specifically noting that Plaintiff reported problems with people of authority but had

11

predominately normal findings upon examination. (R. at 21); (*see* R. at 377) ("[Plaintiff] reported that he has had problems with people in authority because he does not like being told what to do."); (R. at 379) ("[Plaintiff] knew the purpose of the evaluation and was cooperative."). This same consultative examination was central to the state agency psychologists' finding. (R. at 53, 55, 68, 70) (discussing the examination in detail).

Similarly, the ALJ credited the opined limitation regarding no strict production quotas "in light of [Plaintiff]'s borderline intellectual functioning, combined with noted difficulties dealing with stressors and history of agitation." (R. at 23). The ALJ elsewhere noted Plaintiff's "prior IQ testing in the form of the WAIS III with a full[-]scale IQ of 57." (R. at 21) (citing R. at 277). Both state agency psychologists relied upon the same IQ testing in their review of the evidence. (R. at 53, 68). Further, regarding Plaintiff's "difficulty dealing with stressors and history of agitation[,]" (R. at 23), Dr. Tangeman particularly noted Plaintiff's "history of . . . difficulty regulating emotions and responses when stimulated with difficult and / or frustrating situations and circumstances[,]" as well as self-reported "trouble handling stress . . ." (R. at 67–68).

Said differently, though Plaintiff characterizes the ALJ's discussion of the opinions as addressing only consistency, the ALJ addressed particular pieces of medical evidence upon which the state agency psychologists based their findings—the cornerstone of supportability. To the extent these explanations also sound in the language of consistency, it is because these records also typified the ALJ's understanding of the record in its entirety, and both the ALJ and the state agency psychologists undertook a complete review of the available medical evidence. Notably, the ALJ also considered medical records created after the state agency psychologists had rendered their findings. (R. at 22) (citing R. at 548, 583, 594, 605 (behavioral health progress notes from September 2020 to June 2021, noting generally unremarkable mental status examination

findings)). Because the ALJ noted that these new records "lack[ed] positive mental status examination findings[,]" (R. at 22) the new records were consistent with the evidence of record relied upon by the state agency psychologists, which the ALJ found generally demonstrated that Plaintiff's "treatment has been conservative and objective findings on examination limited" (R. at 21). Reading the ALJ's explanation of the state agency psychologists' findings in context of her entire opinion, consideration was given to both the supportability and consistency of the findings.

Still more, while the ALJ's discussion of the state agency psychologists' finding was admittedly brief, this is perhaps in part because she adopted their opined limitations in full, only clarifying the limitations with "vocationally relevant terms" by, for example, defining precisely what superficial social interaction would entail. (R. at 23). Put simply, she did not need to distinguish the state agency psychologists' conclusions about Plaintiff's mental residual functional capacity from her own—which were elsewhere supported in detail and by substantial evidence. (R. at 17–18, 21–23). On appeal, Plaintiff has made no claim that the adopted RFC failed to capture his capacity for work, nor how the findings of the state agency psychologists were erroneous. So while he claims that the ALJ erred in her discussion of the findings, he makes no claim that the adopted findings—which the ALJ purportedly failed to explain—would materially affect the ultimate disability finding. For this additional reason, any error in the ALJ's explanation is harmless. *See, e.g.*, *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'" (quoting *Nat'l Labor Relations Bd. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)); *id.* (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand

a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.")).

All told, the ALJ—in substance if not in explicit language—assessed the supportability and consistency of the state agency psychologists' findings. And her conclusion that the findings were persuasive, as well as her ultimate RFC determination, were supported by substantial evidence. Regarding the state agency psychologists, Plaintiff's assignment of error is without merit.

**B.     Review of the State Agency Physicians' Opinions**

Plaintiff makes a similar argument as to the ALJ's evaluation of the state agency physicians' opinions. Again, Plaintiff says the ALJ failed to discuss supportability, preventing meaningful review of the decision. (Doc. 7 at 7–8). And again, the Court disagrees.

In evaluating the state agency physicians' opinions, the ALJ said:

> The opinions of the state agency medical consultants are partially persuasive. Their findings are generally consistent with objective medical evidence, repeatedly noted normal physical examinations, as discussed above. However, given [Plaintiff]'s noted foot deformities, and his significant podiatric surgery in November 2020, as well as prior surgeries, the undersigned finds greater standing/walking restrictions. However, the record does not indicate standing and walking would be limited to less than 4 hours a day, as the record also repeatedly notes normal gait, and normal musculoskeletal examinations. Furthermore, [Plaintiff]'s most recent records noted him to be recover[ing] well with his surgery and released to full activities and any shoes.

(R. at 23).

Ultimately, the ALJ found that the physicians' findings were "consistent with objective medical evidence, repeatedly noted normal physical examinations, as discussed above." (*Id.*). Many of these records were directly discussed by the state agency physicians and informed the basis of their findings. So, even though the ALJ used the word "consistent" to describe the relationship between the physicians' conclusions and the supporting medical records, she was functionally describing supportability and the physicians' "reference to diagnostic techniques, data

14

collection procedures/analysis, and other objective medical evidence." *Mary W. v. Comm'r of Soc. Sec.*, No. 2:20-cv-5523, 2022 WL 202764, at *8 (S.D. Ohio Jan. 24, 2022) (citing *Reusel v. Comm'r of Soc. Sec.*, No. 5:20-CV-1291, 2021 WL 1697919, at *7 n.6 (N.D. Ohio Apr. 29, 2021)).

For instance, the ALJ noted that "[x]-rays of the bilateral feet showed no fracture, stress fracture or subluxation, with retained hardware in the left hallux proximal phalanx, recurrent left haV, and delta phalanx with adduction of the left toe." (R. at 19). Both state agency physicians detailed the same x-ray findings in their analysis. (R. at 53, 68). Similarly, the ALJ noted an October 30, 2019 examination which found Plaintiff had diminished sensation to light touch in his toes, but no reflex deficits and 5/5 strength. (R. at 20) (referring to R. at 349). Both state agency physicians relied upon the same record in their analysis, also noting decreased light touch sensation but reflexes and strength within normal limits. (R. at 53, 68). At base, the ALJ discussed particular objective evidence upon which the physicians based their findings, and explained why that evidence was significant to Plaintiff's RFC.

Regarding consistency, the ALJ considered some developments in the record after the state agency physicians had made their findings. Most notably, though surgery on Plaintiff's left foot had previously been deferred several times due to Plaintiff's continued smoking (R. at 19–20), he underwent such surgery on November 17, 2020 (R. at 20) (citing R. at 474). Given this "significant podiatric surgery" the ALJ adopted greater "standing/walking restrictions" than did the state agency physicians. (R. at 23). Specifically, both physicians found Plaintiff could stand and/or walk for about six hours in an eight-hour workday (R. at 58, 72), while the ALJ limited that ability to four hours in an eight-hour workday (R. at 18). The ALJ further explained that because Plaintiff was recovering well from the surgery, no further limitation was necessary. (R. at 23); (*see* R. at 21) (noting records from January and February 2021 which demonstrated Plaintiff was healing

15

well and was released to wear all shoe types and pursue all activities).

In sum, regarding the state agency physicians' opinions, the ALJ properly considered both supportability and consistency, and supported her conclusion with substantial evidence.

## IV. CONCLUSION

Based on the foregoing, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 7) and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED.


Date:   March 24, 2023                              /s/ Kimberly A. Jolson
                                                    KIMBERLY A. JOLSON
                                                    UNITED STATES MAGISTRATE JUDGE